UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER L. SIMMONS,<br><br>              Plaintiff,<br><br>      v.<br><br>NANCY A. BERRYHILL,<br><br>              Defendant. | Case No.  16-cv-04435-JCS<br><br>**ORDER ON MOTIONS FOR<br>SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 23, 24 |

## I.    INTRODUCTION

Plaintiff Christopher L. Simmons seeks review of the final decision of Defendant Nancy A. Berryhill,[1] Acting Commissioner of the Social Security Administration ("Commissioner"), denying his application for supplemental security income under Title XVI of the Social Security Act.  Simmons asks the Court to reverse the Commissioner's denial of his application and remand with instructions to award benefits, or, in the alternative, for further administrative proceedings. For the reasons stated below, Simmons's motion is GRANTED, the Commissioner's motion is DENIED, and the case is REMANDED for award of benefits.[2]

## II.    BACKGROUND

### A.    Procedural Background

On April 20, 2012, Simmons applied for supplemental security income, alleging that he had been disabled since March 31, 1989.  Administrative Record ("AR") at 266-267 (Application Summary).   He subsequently amended his onset date to April 20, 2012, the date he filed his application.  AR at 378.  Simmons's claim was initially denied on September 26, 2012, AR 99-

---

[1] Nancy Berryhill became the Acting Commissioner of Social Security on January 23, 2017, and is therefore substituted as Defendant in this action.  *See* 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).
[2] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

107, and his claim was denied upon reconsideration on June 5, 2013. AR at 120. Simmons then filed a written request for a hearing on July 12, 2013. AR at 146-147. A hearing before Administrative Law Judge ("ALJ") Richard P. Laverdure was held on June 24, 2014. AR at 58-98. Simmons appeared and testified at the hearing. Vocational expert ("VE") Joel Greenberg was also present at the hearing, but he did not testify. *Id.* Simmons was represented by attorney Rosemary Dady. *Id.* at 58. The ALJ held a supplemental hearing on February 17, 2015. AR at 41-57. Simmons appeared and testified at the hearing, as did VE Timothy J. Farrell. *Id.* Simmons was again represented by attorney Dady. *Id.* On March 12, 2015, the ALJ issued an unfavorable decision, finding that Simmons was not disabled. *Id.* at 23-34.

Simmons requested review of the ALJ's decision, which the Social Security Administration Appeals Council denied on June 6, 2016, finding "no reason under [its] rules to review the [ALJ's] decision." *Id.* at 1. Simmons filed a complaint on August 5, 2016, seeking judicial review by this Court. Pursuant to Civil Local Rule 16-5, Simmons filed a motion for summary judgment, and the Commissioner filed a cross-motion for summary judgment.

**B. Simmons's Background**

**1. Personal Background**

Simmons was born prematurely to a fourteen year-old mother on March 31, 1989. AR at 335, 379. He had an abdominal wall defect such that his intestines protruded out of his body, requiring multiple surgeries as a baby. AR at 379. Simmons testified that he was neglected as a child. *Id.* at 65–66. At eight years of age, Simmons underwent an audiological evaluation, and it was determined that he had bilateral high frequency sensorineural hearing loss. *Id.* After being referred to attend language and speech therapy classes, Simmons was placed in special education programs for his language and speech deficits. *Id.*

Simmons had to repeat seventh grade and received Ds and Fs in school. AR at 608. He testified that he did not pass ninth grade because it was hard for him to comprehend math and reading and he was very behind. AR at 62. He took the test for a General Equivalency Diploma ("GED") twice but failed on both attempts. Likewise, he does not drive because he failed his driver's test twice. AR at 608.

Simmons reported that he was homeless for several years, that he lived with friends and family, and he has been a resident at the Second Opportunity Christian Center. *Id.* at 458. He has never held a full-time job. From September of 2010 until August of 2012, Simmons worked part-time as a laborer in a city program, the City of Richmond Youth Build, in which he alternated between attending school and working at various job sites, including in construction. *Id.* at 76, 292, 330.

## 2. Medical Background

### a. Childhood Medical Background

Simmons was discharged from the hospital when he was five weeks old, on May 10, 1989. AR at 426. His neonatal discharge summary by Arthur D'Harlingue, M.D., from the Children's Hospital in Oakland, California, states that he received thyroxine treatment for hypothyroidism, "multiple packed red blood cell transfusions to treat anemia," and that Simmons had "a gastroschisis . . . which was repaired via staged reduction, initially with a Silastic pouch over the defect and final closure performed on April 7, [1989]." *Id.* at 426–28. Simmons passed a hearing screening evaluation on April 25, 1989. *Id.* at 428.

On August 15, 1997, Pediatric Audiologist Terry Mitchell, M.S., CCC-A, conducted an audiological and hearing aid evaluation of Simmons. *Id.* at 419. Dr. Mitchell determined that Simmons had "[b]ilateral high frequency sensorineural hearing loss beginning at 1500 Hz" and that Simmons had "significant improvement . . . with amplification." *Id.* Dr. Mitchell recommended that Simmons obtain "hearing aids as soon as possible" so that Simmons could have them before he started the school year. *Id.* Dr. Mitchell also recommended that Simmons "receive speech and language therapy and other special services at school to facilitate his adjustment to new hearing aids" and that his family obtain a hearing aid care kit. *Id.*

At a hearing aid check on October 17, 1997, Dr. Mitchell noted that Simmons's new hearing aids were "functioning according to published specifications" and observed "[a]ppropriate aided responsiveness." *Id.* at 422. Dr. Mitchell recommended that Simmons use his hearing aids consistently at his home as well as at school and that he "receive intensive speech language therapy." *Id.* Dr. Mitchell noted that Simmons's "articulation problem seems directly

related to severity of high frequency hearing loss that has gone unaided for quite some time" and

that he "expected that [Simmons] would make significant gains with intensive therapy. *Id.* at 423.

### b. Emergency Room Visits

On October 16, 2012, Simmons presented at the Kaiser emergency department at

Richmond Hospital, where he reported that he had had abdominal pain since childhood but that it

had gotten worse over the last six months and was now "worse than ever." AR at 470. Simmons

told the attending physician that he had had surgery as a child but could not remember "what it

was." *Id.* No labs or imaging was conducted and Simmons was referred to Richmond Health

Clinic to see a "primary medical doctor/gi." *Id.* At the same visit, Simmons complained of

hearing problems. *Id.* Simmons was told to follow up with his primary medical doctor as well, all

there is no evidence in the record that he had a primary care doctor at that time. *Id.*

Emergency department records also reveal that Simmons went there twice for a toothache,

once on November 30, 2012 and again on December 14, 2012. AR at 472-473. On the first visit

he was diagnosed with a dental abscess and told to see a dentist within 48 hours. *Id.* at 472.

Apparently he did not do so, however, returning two weeks later to the emergency department still

complaining of dental pain. *Id.* at 473. He was given a prescription for Vicodin and once again

instructed to see a dentist. *Id.*

### c. Report from Contra Costa Health Services

An initial psychological evaluation of Simmons was conducted in June 2013 at the West

County Adult Mental Health Clinic. *Id.* at 490. Simmons reported that he "has been hearing

voices of his dead relatives for the last 2–3 years" and that the voices "tell him to do things like

walk into the middle of the street." *Id.* The assessment states that Simmons "feels depressed

because he is not normal," has difficulty taking care of himself, suffers from low self-esteem,

engages in isolative behavior, and suffers from panic attacks. *Id.* Simmons also reported that he

had tried to work about three years before but had gotten fired because "his learning is slow." *Id.*

at 491. Simmons reported that he had stomach pain and that he occasionally took Vicodin or

Norcos provided to him by relatives. *Id.* at 491, 492. He reported that ibuprofen and Motrin cause

him to get a skin rash. *Id.* Simmons stated that he smoked marijuana twice daily. *Id.* at 492.

4

Listed under "Risk Factors" was the notation "saw his neighbor shot when he was a child." *Id.* at 492

On Axis I, Simmons was diagnosed with: (1) "29.89 Psychotic Disorder NOS"; (2) "300.00 Anxiety Disorder NOS"; and (3) "504.30 Cannabis Dependence." *Id.* at 493. For Axis II, his evaluator deferred diagnosis but included the notation "R[ule]/O[ut] Mild M[ental] R[etardation]." *Id.* On Axis III, Simmons was diagnosed with a hearing impairment. *Id.* With respect to Axis IV, Simmons's psychosocial and environmental stressors were listed as "economic, work, housing," and "social support." *Id.* For Axis V, Simmons was diagnosed with a Global Assessment of Function ("GAF") of 45. *Id.* In the comment section, there was a notation that Simmons "has a hearing deficit and has used hearing aids in the past," and that he uses closed captioning to watch television. *Id.*

He was referred to Victor Hong, M.D., for a consultation. *Id.* He was also referred to "Independent Living Resources" and a meeting with a Case Management supervisor. *Id.* at 493.

### d. Victor Hong, M.D.

Victor Hong, M.D., performed Simmons's initial psychiatric assessment on June 28, 2013. *Id.* at 494. Dr. Hong noted that Simmons had "a long history of mental and physical problems," including "depression, hearing things, stomach pains, insomnia and nightmares, poor social support, and bad hearing." *Id.* Dr. Hong also noted that Simmons smoked marijuana on a daily basis and that Simmons took medications given to him by family members for pain relief. *Id.* at 495. Under "medical history," Dr. Hong noted "past surgery on stomach, childhood seizures, hearing loss, migraine headaches." AR at 495.

Dr. Hong's mental status exam revealed that Simmons's "thought content" was remarkable in that he was "somewhat delusional," that his "perceptual disturbance" was remarkable for auditory and visual hallucinations, that "fund of knowledge" was "likely poor" and that his "insight/judgment" and "impulse control" were both "poor." *Id.* at 496. Dr. Hong's diagnoses included "298.9 Psychosis, NOS" and "304.30 Cannabis Dependence" for Axis I. *Id.* at 496. He deferred diagnosis for Axis II, with a rule-out for borderline intellectual functioning. *Id.* For Axis IV, Dr. Hong found that Simmons had the following contributing stressors: (1) "Primary Support";

5

(2) "Social Environment"; (3) "Occupation"; (4) "Housing"; and (5) "Economic." *Id.* He found that Simmons had a GAF of 40 for Axis V. Dr. Hong prescribed Risperdal. *Id.* He also noted that Simmons would need "case management help." *Id.* at 497. [3]

On August 15, 2013, Simmons reported to Dr. Hong that he was "feeling better, more relaxed, with better sleep" and that he was "hearing less voices." *Id.* at 508. Dr. Hong's assessment stated that Simmons "continues to have hallucinations and nightmares, and has cut down his usage of marijuana." *Id.* He further noted that Simmons "continues to have very little social support and will need case management help." *Id.* In terms of medication, Dr. Hong concluded that Simmons "could benefit from an increased dose of Risperdal, as there is moderate improvement thus far." *Id.* His diagnosis remained the same, although he found that Simmons had "s/p surgery on stomach as a child" and "hearing loss" on Axis III. *Id.* Dr. Hong increased Simmons's dosage of Risperdal to 4 mg. *Id.*

e.  Laura Emily Cotter, M.D.

Laura Emily Cotter, M.D., treated Simmons for abdominal pain on July 2, 2013. *Id.* at 519. At that visit she noted tenderness to palpitation around Simmons's abdominal scar. *Id.* at 420. She stated that it was unclear if Simmons's abdominal pain was due to the scar from prior surgery, constipation, or "other abdominal etiology." *Id.* She noted that Simmons had "a number of neonatal abnormalities" and could be suffering from "short gut syndrome." *Id.* She prescribed Simmons: (1) 250 mg capsules of docusate sodium; (2) acidophilus packets; and (3) acetaminophen. *Id.* She noted that Simmons had already been referred to see a gastroenterologist by a previous physician. *Id.*

At a follow up visit on August 1, 2013, Dr. Cotter noted that the etiology of Simmons's abdominal pain was "still unclear." *Id.* at 527. Dr. Cotter further noted that the source of Simmons's pain could be "scar/adhesion from prior surgery" but that his "symptoms do not sound consistent with neuropathic pain." *Id.* Dr. Cotter noted that Simmons had seen a gastroenterologist (Dr. Hauck, discussed below), but the gastroenterologist's "note only mentions

---

[3] A progress note by an MFT at Contra Costa Health Services dated July 16, 2013 also noted that Simmons would need case management "due to safety concerns." AR at 504.

concern for drug seeking behavior." *Id.* at 526. Dr. Cotter again prescribed acidophilus and counseled Simmons about the risks associated with chronic pain medication use. *Id.* at 527.

### f. Brian P. Hauck, M.D.

Brian P. Hauck saw Simmons for chronic abdominal pain on July 25, 2013.[4] *Id.* at 522. Dr. Hauck's "assessment" stated "see above." The only comment that he included on the form (and what the Court assumes he was referring to) states: "Chronic abdominal pain for 3 years. Poor historian and has schizophrenia. Seems to be seeking pain medicine." *Id.* Dr. Hauck did not include any specific diagnosis in his notes. *Id.*

### g. Catherine Frances, D.O.

Catherine Frances, D.O., has been Simmons's treating physician since October 2013. *Id.* at 664. According to a report dated June 20, 2014, Dr. Frances diagnosed Simmons with: (1) Post Traumatic Stress Disorder, chronic, 309.81; and (2) Psychotic Disorder, NOS, 298.9. *Id.* Dr. Frances noted that Dr. Hong had initially prescribed Risperdal. *Id.* Dr. Frances continued to prescribe Risperdal, prescribing 4 mg daily. *Id.* Dr. Frances also noted that she prescribed Simmons Prozasin, which she remarked has "appear[ed] to have helped with [Simmons's] visual hallucinations and nightmares." *Id.*

Dr. Frances described Mr. Simmons's affect as being "typically flat or blunted." *Id.* She found that Simmons "exhibits concrete thinking, indicative of likely borderline intellectual functioning." *Id.* Dr. Frances noted that Simmons "was identified as needing case management services due to his slow cognition" and that Simmons "appears to have difficulty advocating for himself." *Id.* Dr. Frances also indicated that Simmons: (1) "often expresses confusion about his medication refills"; (2) "presents with psychomotor retardation and a depressed mood"; and (3) "is hearing impaired, which the sound of his speech and annunciation is indicative of and for which he now has bilateral aids to assist." *Id.*

Dr. Frances noted that Simmons "gives a somewhat confusing history" and that she "suspect[s] [Simmons] has difficulty tracking and communicating his condition and events in his

---

[4] The record reflects that Dr. Hauck was in the Gastroenterology Department at West Contra Costa Health Center. AR at 521. The Court presumes he is a specialist in gastroenterology.

life." *Id.* As an example, Dr. Frances pointed out that Simmons had stated he could not read, but he has also "acknowledge[d] that he does read, just that he can't read very well." *Id.* According to Dr. Frances, Simmons reported that "he has seen ghosts of dead relatives and has reported hearing voices." *Id.* Dr. Frances also added that Simmons "has suffered losses of several loved ones, including witnessing his aunt die of gunshot wounds, which is a particularly distressing event for him." *Id.*

While Dr. Frances acknowledged Simmons had made some improvements with medication, she also noted that "his level of functioning is still poor." *Id.* Dr. Frances elaborated by stating that Simmons's "limited cognitive functioning and challenges with communication render him particularly vulnerable and he continues to require ongoing treatment and case management supports." *Id.* In terms of how Simmons would fare in an employment setting, Dr. Frances anticipated that Simmons would "have difficulty following instructions, keeping up with coworkers and consistently meeting production demands." *Id.* Furthermore, Dr. Frances also noted that "during times of increased symptomology," she "would expect [Simmons] would have difficulty staying focused." *Id.* Dr. Frances concluded by stating that because Simmons "has such difficulties currently managing himself in a relatively undemanding milieu, it is hard to fathom how he could adapt to competitive work." *Id.*

In an update to her June 2014 report, Dr. Frances stated in February of 2015 that she continued to treat Simmons and that his diagnoses were the same, namely Post Traumatic Stress Disorder and Psychotic Disorder, NOS. *Id.* at 692. Dr. Frances noted that she and Simmons had "developed a good rapport" and that Simmons "continues to show improvement in reducing his psychotic symptoms" while continuing the use of his medications Risperdal and Prozasin. *Id.* While Simmons had made "modest improvement," Dr. Frances indicated that his "presentation continues to indicate quite limited functioning," which "makes it even harder for [Simmons] to compensate and cope with his psychiatric symptoms." *Id.*

In terms of Simmons's ability to engage in competitive employment, Dr. Frances noted that she "continue[d] to believe that [Simmons] is still not appropriate for a competitive setting at this point," but she also noted that Simmons "has made slow but gradual progress with his mental

health." *Id.* Dr. Frances indicated that it may be possible, eventually, for Simmons "to thrive in a supportive learning and vocational environment." *Id.* However, she still could "not imagine" that Simmons "could keep up with job demands, consistently follow even simple instructions, and understand coworkers." *Id.*

### h. Eugene McMillan, M.D.

Eugene McMillan, M.D., evaluated Simmons on August 15, 2012. *Id.* at 454. Dr. McMillan's impression was that Simmons has: (1) visual impairment in his right eye; (2) myopia in his left eye; (3) a mild hearing impairment; and (4) a history of low back pain. *Id.* at 456. In terms of Simmons's history, Dr. McMillan noted that Simmons "was vague and inconsistent with answering questions" and that his "history is somewhat inconsistent." *Id.* at 454, 456. For example, in his functional capacity assessment, Dr. McMillan indicated that Simmons claimed he was "completely illiterate, but review of his intake papers, which [Simmons] completed, show that the records were completed and handwriting was neat, and there was detailed information that he supplied including phone numbers and addresses." *Id.* at 456. Dr. McMillan's functional capacity assessment also stated that:

> [Simmons] would be able to occasionally lift and carry 50 pounds and frequently lift and carry 25 pounds. He would be able to stand and walk for at least six hours during an eight-hour day. He would be able to sit for eight hours during an eight-hour workday. He is not currently using an assistive device. He would be able to engage in activities that require climbing, balancing, stooping, kneeling, crouching and crawling for more than one third of a workday. He would have no limitations with speaking. He was able to hear questions today spoken in a normal tone and voice and he had no problem speaking clearly, although there was some inconsistency noted in his effort at speaking. There would be no limitations with reaching in all directions. He would have no limitations with gross or fine manipulation. There would be no environmental limitations for heights, moving machineries, temperatures, chemicals, or dust.

*Id.*

### i. Ute Kollath, Ph.D.

Ute Kollath, Ph.D., performed a mental status evaluation of Simmons on August 29, 2012. *Id.* at 457. Dr. Kollath indicated that Simmons's chief complaints were: (1) stomach pain; (2) diminishing eyesight; (3) a speech impairment; (4) hearing loss; and (5) visual hallucinations. *Id.*

Dr. Kollath noted that Simmons "was considered to be an unreliable historian." *Id.* Concerning

his stomach pain, Simmons reported that he: (1) "was born with a hole in his stomach"; (2)

"underwent at least 37 surgeries to address his stomach condition"; and (3) the "surgeries were not

helpful and that the pain in his stomach has increased over the years." *Id.* With respect to his

vision, Simmons indicated that "about 3 years ago he started to experience decreased vision in his

right eye." *Id.* Concerning his ability to hear, Simmons informed Dr. Kollath that he was born

with a hearing impairment. *Id.* Simmons also told Dr. Kollath that "his hearing impairment

interferes with his ability to understand instruction." *Id.* Dr. Kollath observed that Simmons

"appeared to be able to follow verbal interaction at a conversational volume well." *Id.* With

respect to Simmons's visual hallucinations, Simmons reported to Dr. Kollath that his visual

hallucinations began when he was five years old "and that he sees ghost [sic]." *Id.* Concerning

Simmons's current level of functioning, Simmons reported to Dr. Kollath that he had "physical

limitations due to medical problems." *Id.* at 459. While Simmons is unable to drive, Dr. Kollath

noted that he "does not need help preparing meals" and that "[h]e is able to make change at the

store." *Id.*

Dr. Kollath performed a complete psychological evaluation as well as a Folstein Mini

Mental State Exam. *Id.* at 459. She "considered" the results "to be an unreliable representation of

[Simmons's] current psychological functioning" *Id.* Nonetheless, she found that his "history and

clinical presentation is indicative of a neurocognitive disorder." *Id.* Dr. Kollath noted that

Simmons "had no difficulty following simple and moderately complex directions." *Id.* She

further noted that Simmons "presented with suboptimal effort and results cannot be considered as

a reasonably valid or reliable estimate of his level of functioning." *Id.* Dr. Kollath found that

Simmons scored a 20 out of 30 on the Folstein Mini Mental State Exam and scored a GAF of 64.

*Id.* at 459–60.

In terms of diagnostic impressions, Dr. Kollath diagnosed Simmons as having no diagnosis

or condition on Axis I. *Id.* at 460. On Axis II, Dr, Kollath diagnosed Simmons with borderline

intellectual functioning. *Id.* She deferred diagnosis for Axis III. *Id.* With respect to Axis IV, Dr.

Kollath diagnosed Simmons with "Problems related to: General life stressors." *Id.* For Axis V,

Dr. Kollath diagnosed Simmons with a GAF of 64. *Id.*

j. Lisa Kalich, Psy.D.

Lisa Kalich, Psy.D., conducted a psychological evaluation of Simmons on February 18, 2014. *Id.* at 607. Concerning Simmons's background, Dr. Kalich acknowledged that Simmons "is a relatively poor historian" and that "there are concerns about his credibility." *Id.* Accordingly, Dr. Kalich reported that "any information provided by Mr. Simmons which is not corroborated through collateral documentation should be viewed with caution." *Id.* Dr. Kalich further noted that, "[i]n reviewing prior documentation, it appears that Mr. Simmons provided some inconsistent or discrepant information regarding a variety of issues, including the onset of his psychotic symptoms, his work history, and his medical history, suggesting that his credibility as a reporter and historian is poor." *Id.* at 610–11.

For example, turning to Simmons's mental health history, Dr. Kalich reported that Simmons informed her that, "since age ten, he has experienced auditory and visual hallucinations." *Id.* at 609. She also noted, however, that Simmons "has provided inconsistent information regarding when his symptoms began," as he has also reported to other physicians that the onset of his hallucinations took place in 2005 and in 2010 or 2011. *Id.* Concerning the nature of his hallucinations, Dr. Kalich noted that Simmons "described these experiences as seeing and speaking to ghosts and deceased loved ones, including his grandmother, his aunt, his cousin, his great grandfather, and several friends." *Id.* Simmons reported that he usually "sees ghosts two to three times per day" and "speaks to them about his life." *Id.* Dr. Kalich also noted Simmons informed her that "he sometimes places himself in dangerous situations, as the result of his auditory and visual hallucinations." *Id.* at 610. As an example, Dr. Kalich reported that "while following and speaking to a ghost, Mr. Simmons 'zones out' and may cross the street without looking or may be unaware of his environment." *Id.*

In terms of test results, Dr. Kalich used the Weschler Adult Intelligence Scale-IV (hereinafter, "WAIS-IV") to measure Simmons's "verbal ability, the manipulation of concrete materials, short-term memory, and cognitive processing efficiency." *Id.* at 611. According to the WAIS-IV results, Simmons scored a Full Scale IQ of 52, "which falls in the extremely low range

of functioning." *Id.* She noted that "[d]ue to concerns about Mr. Simmons' response style, it is possible that his scores on the WAIS-IV are an underrepresentation of his true level of intelligence." *Id.* She found, however, that if the WAIS-IV were readministered, there was a 95% chance that his score would fall between 49 and 57. *Id.*

Dr. Kalich also used the Weschler Memory Scale-III-Abbreviated to evaluate Simmons's "auditory and visual memory abilities." *Id.* at 612. She reported that Simmons scored a "Total Memory Composite of 66, which places him in the extremely low range of functioning." *Id.* She further found that "if the WMS-III-A were readministered, there is a 95% chance that his score would fall between 57 and 74" and noted that "[d]eficits of this severity are likely to lead to problems in day-to-day functioning." *Id*

Based on "clinical interviews, behavioral observations, and psychological testing," Dr. Kalich found that "the following diagnostic impressions appear to best characterize Mr. Simmons' functioning." *Id.* For Axis I, Dr. Kalich diagnosed Simmons as having: (1) "298.9 Psychotic Disorder Not Otherwise Specified"; (2) "311 Depressive Disorder Not Otherwise Specified"; and (3) "Rule Out Posttraumatic Stress Disorder." *Id.* With respect to Axis II, Dr. Kalich diagnosed Simmons with "V.62.89 Borderline Intellectual Functioning, Provisional; Rule Out Mild Mental Retardation." *Id.* Dr. Kalich deferred diagnosis for Axis III. *Id.* For Axis IV, Dr. Kalich diagnosed Simmons with "Occupational problems, Economic Problems, Problems with primary support group." *Id.* Regarding Axis V, Dr. Kalich found that Simmons had a GAF of 50. *Id.* Dr. Kalich also noted that Simmons's "diagnostic presentation is complicated by his presentation style." *Id.*

Dr. Kalich also made findings as to Simmons's abilities to perform work related activities. As to activities of daily living, she found that Simmons "likely experiences moderate to severe impairment" because of his cognitive and memory impairment. AR at 613. She opined that these "deficiencies would detract from his ability to remember complex or detailed instructions, to complete mental arithmetic, and to function in most job settings which require completion of two or more step tasks or use of short term memory." *Id*. She further opined that his "cognitive deficits may also cause impairment in his ability to complete age-appropriate daily tasks," such as

12

grocery shopping, and that his "psychotic symptoms" caused him to "zone out" and that this, in turn, caused "deficits in his ability to attend to his safety." *Id.* She pointed to his inability to cook for fear he would leave the stove on and reports that he had walked into the street without looking and almost been hit. *Id.*

With respect to social functioning, Dr. Kalich found that Simmons had at a minimum mild deficits, citing mental health treatment records indicating that he had experienced anxiety and paranoia around others, leading him to isolate himself. *Id.* at 614.

Dr. Kalich found Simmon's impairment with regard to concentration is "intermittently severe." *Id.* She stated:

> Mr. Simmons's auditory and visual hallucinations are likely to be distracting to him as he describes "zoning out" during these episodes. When Mr. Simmons experiences an auditory or visual hallucination, he is likely unable to shift his attention or focus on his environment. For example, he described walking into ongoing traffic, following a "ghost." Were these symptoms to be triggered in a work setting, Mr. Simmons would have great difficulty focusing on a task. His deficits in attention are further reflected by his low Working Memory Index score on the WAIS-IV. Cognitive testing also suggested moderate to severe impairments in his pace of work which may be related to depression. Due to his symptoms of depression, Mr. Simmons may also experience mild deficits with regard to persistence.

*Id.*

Finally, with respect to episodes of decompensation, Dr. Kalich wrote, "it appears Mr. Simmons has had chronic difficulties with his language and cognitive abilities" that resulted in him repeating seventh grade and being placed in special education. *Id.* She continued, "though Mr. Simmons may be exaggerating his deficits in some areas, these problems appear significant enough to impact his day-to-day functioning." *Id.* She further opined that [a]s intelligence typically remains stable across the lifespan, Mr. Simmons is not likely to show gains in his cognitive abilities." *Id.* She concluded that with respect to his mental health functioning, Simmons has been "experiencing an episode of decompensation" over the past several years and that he is likely to experience future episodes of decompensation due to his "vulnerable" emotional state. *Id.*

           k.   Robert E. Pelc, Ph.D., ABPP

The ALJ propounded medical interrogatories to Robert E. Pelc, Ph.D., a psychologist and expert witness who reviewed medical records that were provided to him but did not examine Simmons. *Id.* at 26, 665. Dr. Pelc identified Simmons's impairments as follows: (1) "12.03 Psychosis NOS"; (2) "12.06 Anxiety NOS"; (3) "12.09 Cannabis Dependence"; (4) "12.05 Borderline Intell. Funct."; and (5) "12.04 Depression." *Id.* at 665. Dr. Pelc rated Simmons's restriction of activities of daily living as being mild because Simmons lives by himself, is "well groomed," can perform basic activities of daily living even though he is unable to drive. *Id.* at 666. He classified Simmons's difficulties in maintaining social functioning as moderate, as Simmons maintains relationships with friends and family. *Id.* Although Dr. Pelc found that Simmons is "cooperative and interactive," he also noted that Simmons engages in "some social avoidance." *Id.* Concerning Simmons's difficulties in maintaining concentration, persistence, or pace, Dr. Pelc found that they were moderate for simple tasks and marked for complex tasks based on his test scores. *Id.* Lastly, Dr. Pelc noted that Simmons had no documented episodes of decompensation. *Id.*

Dr. Pelc found that none of Simmons's impairments meet or medically equal the criteria for any impairment as described in the Listing of Impairments because Simmons "[d]oes not demonstrate at least 2 marked impairments in B criteria, or one extreme limitation." *Id.* at 667. Additionally, Dr. Pelc found that none of Simmons's impairments establish the presence of the "C" criteria because the record did not contain any presence of decompensation. *Id.* at 668. He concluded that Simmons could engage in "simple, repetitive work tasks learned [within] 1-3 [months] with only occasional contact with others, including [members of the] gen[eral] pub[lic], sup[eriors], [and] coworkers." *Id.* at 669. He further noted that Simmons possesses "[p]oor adaptation capacity due to psychological factors unless involved in only simple, repetitive tasks" and that it was unclear whether Simmons's impairments included alcohol and substance abuse due to minimal evidence in the record. *Id.* at 671. Lastly, Dr. Pelc found that Simmons was unable to manage benefits in his own best interest because of his low IQ and marijuana use. *Id.* at 672.

1. Function Reports

On June 18, 2012 an Adult Function report was completed by Simmons and a Third Party

14

Function Report was completed by Eva George, a friend who has known Simmons for seven years. AR at 339-354. Simmons appears to have completed the first two pages himself, with brief narrative responses to two questions,[5] but George took over after that and listed her name at the bottom of both forms. Both forms are signed by George. *Id.* George states that Simmons "can't use the stove," that when he uses public transportation he "has trouble finding his way" and "gets confused" and that he can't handle his own finances because of confusion and memory issues. *Id.* at 341-342. She states that he is "afraid to trust" other people and has "trouble understanding instructions." AR at 344. She further states that Simmons has to be reminded to take care of medical appointments and "needs someone to remind him of what to do" when he does house or yard work. *Id.* at 349. With respect to public transportation, he "needs someone to go with him to show him where to go and what bus to catch." AR at 350. She states that Simmons doesn't want to be around other people because he "can't hear well" and is afraid to trust anyone. *Id.* at 352.

**C.    Hearing on June 24, 2014**

The ALJ held an initial hearing on June 24, 2014 with Simmons, his counsel, and VE Greenberg. *Id.* at 60. The ALJ began his examination of Simmons by asking about Simmons's work history. *Id.* at 61. Simmons testified that he was not currently working, but that he last worked in "2012 probably." *Id.* Simmons further testified that he stopped working due to increasing chronic physical pain as well as mental issues. *Id.* at 61–62.

Counsel for Simmons, Ms. Rosemary Dady, began her examination of Simmons by asking about his educational background. Simmons responded that he did not pass the ninth grade and that "it was hard for [him] to comprehend and keep up on the type of work and stuff [he] was learning." *Id.* Dady then mentioned that Simmons was absent for nearly half of the school days while he was in ninth grade, and Simmons explained that he frequently missed school because he lived far away from his school and did not have bus fare or lunch money. *Id.* at 62–63. Dady then

---

[5] For example, on the first page, asking Simmons to describe his daily activities, he wrote "Take a walk around Marina Park until my stomack [sic] starts to hurting cause of my disabled. I be afraid to be around a croud [sic] of people." AR at 339.

asked whether Simmons had any difficulties when he attended school prior to the ninth grade, and Simmons responded that it was difficult for him to learn because people made fun of him. *Id.* at 63–64. Dady also asked Simmons about the amount of effort Simmons put into taking tests, noting the evaluator at Bay View Medical Clinic "said that [Simmons] didn't really put enough effort forward with the test." *Id.* at 64. Simmons replied that he did all that he could do and that he sometimes gives up on tests after multiple attempts. *Id.* at 64–65. He elaborated that he had been neglected as a child and had had no one to teach him "how to do this and . . . how to do that." *Id.* at 65. Dady then asked why it had taken Simmons so long to seek treatment, and Simmons testified that he "didn't know which steps to take to make the decisions," that he "didn't know exactly what [he] had to do" to get help, that he did not have health insurance and he did not have money to pay for medications. *Id.* at 66–67. He explained that eventually an "older lady friend" who is "like an auntie" to him "showed [him] the things that [he] needed to do to get . . . [his] medications and stuff going" because she "knew [he] had problems . . . [and] was a slow learner." *Id.* at 67.

Dady asked Simmons about the medical treatment he was currently receiving and whether Simmons felt that his health had sufficiently improved so that he could "work a simple job." *Id.* at 67, 71. Simmons testified that he had recently seen Dr. Frances and Dr. Hong. *Id.* at 68. Dady also asked Simmons about his marijuana use, and Simmons replied that "it was the only thing that would help [him] relax" on account of not having any other medication. *Id.* at 69. He stated that he has since stopped using marijuana and that his medications are helping him see ghosts less often. *Id.* at 69–70. He further stated that he still has bad dreams, but they are no longer as severe as they used to be. *Id.* at 70. Concerning his ability to work, Simmons testified that he had not "gotten quite well to the point where [he] felt like [he] [was] safe to go out on the field and start working and stuff like that again." *Id.* at 71. Concerning his worsening physical pain, Simmons testified that he experiences "[b]ad, sharp pain problems" in his heart and in his stomach. *Id.* at 73.

With respect to "the claims of [Simmons] being an unreliable historian," Dady stated that "there's a certain question about reliability just following [Simmons's testimony]." *Id.* at 92. She

16

continued by stating that "nobody is suggesting that [Simmons] is intentionally malingering," but that Simmons's testimony indicates that "something is wrong" in that he "seems slow." *Id.* at 92–93.

### D.    Supplemental Hearing on February 17, 2015

The ALJ held a supplemental hearing on February 17, 2015 to take additional vocational testimony related to the RFC set forth in Dr. Pelc's interrogatory responses. *Id.* at 43. The hearing took place at the request of Simmons's attorney. *Id.* The ALJ examined Simmons regarding his prior work history. *Id.* He began by asking Simmons whether he had ever had a full-time job. *Id.* at 46. Simmons said "no." *Id.* The ALJ followed up by asking whether his past work "[w]as . . . all just sporadic and part-time work." *Id.* Simmons answered "no" again. *Id.* The ALJ then asked Simmons about his work history, and Simmons testified that the longest period he had worked was approximately six months. *Id.*

The ALJ then took testimony from the VE regarding jobs that would fit Dr. Pelc's opinion that Simmons could "perform simple, repetitive work tasks learned w/in 1-3 mos." *Id.* at 47. He began by asking the VE what the "typical time period" is for training a worker for an unskilled job, and the VE responded that training requires no more than thirty days for a Specific Vocational Preparation (hereinafter, "SVP") of 1 or 2. Dady then argued that Dr. Pelc's findings that Simmons would require between one and three months to learn simple and repetitive work tasks was inconsistent with the VE's testimony. *Id.* The ALJ then asked Dady whether it would meet the SVP definition of 1 or 2 if Simmons could learn a particular job within 30 days, and Dady answered in the affirmative. *Id.* at 48–49. The ALJ then asked the VE to assume:

> [U]p to medium work—sedentary, light, medium; individual the claimant's age, education, and no relevant work experience; simple, repetitive work tasks meeting that definition of being able to learn within 30 days—30 days or less; only occasional contact with others including the general public, supervisor, and coworkers.

*Id.* at 51. He asked the VE whether there were "any jobs at the sedentary, light, or medium exertional levels that fit that definition" as described above. *Id.* The VE responded that there are jobs at both the medium and light exertional levels. *Id.* The VE testified that the following jobs

would fit the hypothetical at the medium level of work: (1) janitor, with 206,000 jobs nationally and 31,000 in California; (2) order picker, with 42,000 jobs nationally and 4,000 in California; and (3) laboratory equipment cleaner, with 26,000 jobs nationally and 4,000 in California.  *Id.*  At the light level of work, the VE testified that the following jobs would also satisfy the hypothetical: (1) cleaner housekeeping, with 160,000 jobs nationally and 16,000 in California; and (2) finish inspector, with 20,000 jobs nationally and 2,000 in California.  *Id.* at 52.

Dady then asked the VE whether the hypothetical worker as described above would be able to perform the jobs he listed if that hypothetical worker "require[d] intensive individualized assistance from a supportive boss" such as providing "hourly feedback."  *Id.*  The VE responded that hourly feedback would not be available for unskilled work and that if a worker is "off task" because of his problems and must be refocused by a supervisor for 15% or more of the time in a day, that worker would not be able to maintain his employment.  *Id.* at 53.  Dady also asked the VE to address whether the hypothetical worker could work in any of the jobs described by the VE if he "had such difficulties with keeping up with the demands of the work that they might have to leave during the work shift."  *Id.*  The VE responded that "some employers would fire them the first time" while others might afford some "flexibility."  *Id.* at 54.

### E.    Legal Background for Determination of Disability

#### 1.    Five-Step Analysis

Disability insurance benefits are available under the Social Security Act when an eligible claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 432(a)(1).  A claimant is only found disabled if his physical or mental impairments are of such severity that he is not only unable to do his previous work but also "cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  The claimant bears the burden of proof in establishing a disability.  *Gomez v. Chater*, 74 F.3d 967, 970 (9th Cir. 1996).

The Commissioner uses a "five-step sequential evaluation process" to determine if a

claimant is disabled. 20 C.F.R. § 404.1520(a)(4). At Step One, the ALJ must determine if the claimant is engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(I). If so, the ALJ determines that the claimant is not disabled and the evaluation process stops. If the claimant is not engaged in substantial gainful activity, then the ALJ proceeds to Step Two.

At Step Two, the ALJ must determine if the claimant has a "severe" medically determinable impairment. An impairment is "severe" when it "significantly limits [a person's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant does not have a "severe" impairment, then the ALJ will find that the claimant is not disabled. If the claimant does not have a severe impairment, the ALJ proceeds to Step Three.

At Step Three, the ALJ compares the claimant's impairment with a listing of severe impairments (the "Listings"). *See* Appendix 1, Subpart 1 of 20 C.F.R. Part 404. If the claimant's impairment is included in the Listings, then the claimant is disabled. The ALJ will also find a claimant disabled if the claimant's impairment or combination of impairments equals the severity of a listed impairment. If a claimant's impairment does not equal a listed impairment, then the ALJ proceeds to Step Four.

At Step Four, the ALJ must assess the claimant's Residual Function Capacity ("RFC"). An RFC is "the most [a claimant] can still do despite [that claimant's] limitations . . . based on all the relevant evidence in [that claimant's] case record." 20 C.F.R. § 404.1545(a)(1). The ALJ then determines whether, given the claimant's RFC, the claimant would be able to perform his past relevant work. 20 C.F.R. § 404.1520(a)(4). Past relevant work is "work that [a claimant] has done within the past fifteen years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn how to do it." 20 C.F.R. § 404.1560(b)(1). If the claimant is able to perform his past relevant work, then the ALJ finds that he is not disabled. If the claimant is unable to perform his past relevant work, then the ALJ proceeds to Step Five.

At Step Five, the burden shifts from the claimant to the Commissioner. *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009). The Commissioner has the burden to "identify specific jobs existing in substantial numbers in the national economy that the claimant can perform despite his identified limitations." *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir.

1 | 1999) (quoting *Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1999)).  If the Commissioner is
2 | able to identify such work, then the claimant is not disabled.  If the Commissioner is unable to do
3 | so, then the claimant is disabled.  20 C.F.R. § 404.1520(g)(1).

**2.  Supplemental Regulations for Determining Mental Disability**

Where there is evidence of a mental impairment that allegedly prevents a claimant from working, the Social Security Administration has supplemented the five-step sequential evaluation process with additional regulations to assist the ALJ in determining the severity of the mental impairment, establishing a "special technique at each level in the administrative review process." 20 C.F.R. §§ 404.1520a(a), 416.920a(a).  First, the Commissioner evaluates the claimant's "symptoms, signs, and laboratory findings" to determine whether the claimant has a "medically determinable impairment."  20 C.F.R. §§ 404.1520a(b)(1).  For each of the eleven categories contained in the adult mental disorder listing, these are described in Paragraph A.  20 C.F.R. pt. 404, Subpt. P., App. 1, § 12.00.

If the claimant has a "medically determinable mental impairment," the Commissioner goes on to rate the degree of the claimant's functional limitation in the four "broad functional areas" identified in "paragraph B" and "paragraph C" of the adult mental disorders listings.  *See* 20 C.F.R. §§ 404.1250a(c)(3), 416.920a(c)(3); Social Security Ruling 96-8p, 1996 WL 374194, at *4. Those four functional areas are "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation."  20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3).  Limitations are rated on a "five point scale: None, mild, moderate, marked, and extreme."  20 C.F.R. §§ 404.1520a(c)(4), 416.920a(c)(4).  Based on these limitations, the Commissioner determines whether the claimant has a severe mental impairment and whether it meets or equals a listed impairment.  *See* 20 C.F.R. §§ 404.1520a(d)(1)–(2), 416.920(d)(1)–(2). This evaluation process is to be used at the second and third steps of the sequential evaluation discussed above.  Social Security Ruling 96-8p, 1996 WL 374184, at *4 ("The adjudicator must remember that the limitations identified in the 'paragraph B' and 'paragraph C' criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process.").

United States District Court
Northern District of California

If the Commissioner determines that the claimant has a severe mental impairment(s) that neither meet nor is equal to any listing, the Commissioner must assess the claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3), 416.920(d)(3). This is a "mental RFC assessment [that is] used at steps 4 and 5 of the sequential process [and] requires a more detailed assessment by itemizing various functions contained in the board categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments . . . ." Social Security Ruling 96-8p, 1996 WL 374184, at *4.

### F.    The ALJ's Decision

#### 1.    Step One: Substantial Gainful Activity

At Step One, the ALJ found that "[t]here is no evidence of substantial gainful activity since April 20, 2012." *Id.* at 25.

#### 2.    Step Two: Severe Impairments

At Step Two, the ALJ determined that Simmons "has the following severe impairments: depressive disorder; psychotic disorder NOS; borderline intellectual functioning; and cannabis dependence." *Id.* The ALJ found that "the above-cited impairments more than minimally affect [Simmons's] ability to do work-related tasks" and determined that they are "'severe' within the meaning of the Social Security Act and regulations." *Id.*

#### 3.    Step Three: Medical Severity

At Step Three, the ALJ determined that Simmons did "not have an impairment or combination of impairments that meets or medically equals the severity of" listings 12.03, 12.04 or 12.05. *Id.* at 26. In making that determination, the ALJ "considered whether the 'paragraph B' criteria ('paragraph D' criteria of listing 12.05) are satisfied." *Id.* He noted that in order "[t]o satisfy the 'paragraph B' criteria . . . the mental impairments must result in at least two of the following: marked restriction of activities of daily living, marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration." *Id.*

The ALJ noted that he propounded medical interrogatories to Dr. Pelc, and based on Dr. Pelc's findings he concluded that Simmons "has mild restriction in activities of daily living;

moderate difficulties in social functioning; moderate difficulties with regard to concentration, persistence or pace; and has experienced no episodes of decompensation." *Id.* Because Simmons's "mental impairments do not cause at least two 'marked' limitations or one 'marked' limitation' and 'repeated' episodes of decompensation, each of extended duration," the ALJ concluded that the 'paragraph B' criteria were not satisfied. *Id.*

The ALJ also considered whether the "paragraph C" criteria of listings 12.03 or 12.04 were met. *Id.* With respect to "paragraph C" criteria, the ALJ found that "the evidence fails to establish the presence of 'paragraph C' criteria" because: (1) as discussed by Dr. Pelc, "there is no documentation of decompensation," because Simmons's "problems are of a chronic nature"; (2) there is insufficient "evidence for a finding that [Simmons's] mental impairment(s) have resulted in such marginal adjustment that even a minimal increase in mental demands or changes in the environment would be predicted to cause the individual to decompensate"; and (3) Simmons did not have "a history of 1 or more years' inability to function outside a highly supportive living arrangement." *Id.* at 26–27.

The ALJ also rejected the argument that Simmons's "borderline intellectual functioning meets the criteria of Listing 12.05" for three reasons. *Id.* at 27. First, the ALJ concluded that the listing requirements in "paragraph A" of Listing 12.05 were not met because there was "no evidence to indicate" that Simmons's mental incapacity was "evidenced by dependence upon others for personal needs," such as "toileting, eating, dressing, or bathing." *Id.* Second, the ALJ found that the "paragraph B" criteria were not met because Simmons "does not have a valid verbal, performance, or full scale IQ of 59 or less." *Id.* The ALJ noted that "[t]esting by Dr. Kalich reflects a verbal comprehension index (VCI) or Full Scale IQ of 52; Perceptual Reasoning Index (PRI) of 52; Working Memory (WMI) of 63; and Processing Speed Index (PSI) of 56." *Id.* He concluded, however, that the criteria for "paragraph B" were not met because Dr. Kalich reported that Simmons's "effort varied, and, at times, it appeared that his responses were an underrepresentation of his abilities." *Id.* He also found that the "paragraph B" criteria were not equaled based on Dr. Pelc's findings that Simmons's impairments neither met nor equaled the criteria for "paragraph B." *Id.* Third, the ALJ found that "the 'paragraph C' and 'paragraph D'

criteria of Listing 12.05 are not met because [Simmons] does not have a valid verbal, performance, or full scale IQ of 60 through 70." *Id.* Finally, he stated that his findings at Step Four with respect to RFC reflected the functional capacity assessment he had found at Step Three under Paragraph B (as to Listings 12.03 and 12.04) and Paragraph D (as to Listing 12.05).

### 4. Step Four: Residual Functional Capacity

The ALJ concluded that Simmons "has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he is limited to simple repetitive work tasks learned within 1 to 3 months, with only occasional contact with others, including the general public, supervisors, and co-workers." *Id.* at 28.

In reaching this determination, the ALJ began by summarizing Simmons's medical records. *Id.* at 28–31. After the ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," he found that Simmons's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms." *Id.* The ALJ also concluded, however, that Simmons's "statements concerning the intensity, persistence, and limiting effects" of his impairments were not entirely credible. *Id.* at 31. The ALJ noted that he was "not completely persuaded that Mr. Simmons even suffers from borderline intellectual functioning," but he included it in Simmons's residual functional capacity "due to the opinions of some examiners." *Id.* at 31. He did not "credit any 'cognitive disorder' diagnosis" due to inconsistencies in Simmons's medical records. *Id.* at 32.

The ALJ also found that "[t]here are other inconsistencies in the record, which further diminish [Simmons's] credibility." *Id.* In particular, the ALJ pointed to Simmons's "inconsistent reports of traumatic experiences and onset of symptoms." *Id.* Concerning the onset of his Simmons's symptoms, the ALJ noted that Simmons "told Dr. Kollath that he began having visual hallucinations (seeing ghosts) at the age of 5." *Id.* In contrast, Simmons reported to Dr. Kalich that "he has had auditory and visual hallucinations since the age of 10." *Id.* He further noted that, according to Dr. Kalich, Simmons "had previously reported to his treating providers that the alleged psychotic symptoms began around 2010 or 2011." *Id.* He further noted that "[a]nother

23

treatment note reports that [Simmons's] symptoms began in 2005." *Id.*

With respect to the nature of Simmons's hallucinations, the ALJ noted that Simmons's reports of his auditory and visual hallucinations have also varied. *Id.* The ALJ pointed out that Simmons "told Dr. Kalich that he sees ghosts two to three times per day" and "reported that he communicates with them about his life." *Id.* In his intake interview at Contra Costa Health Services, by contrast, Simmons "reported that the voices tell him to do thing [sic] like walk into the middle of the street." *Id.* Concerning how Simmons has "describe[d] traumatic events," the ALJ noted that Simmons "told Dr. Kalich that he had witnessed a neighbor being shot as a child, and had seen the body of his aunt who had been shot in the head." *Id.* He further noted that this report "differs from his reports to Contra Costa Health, wherein he reported the loss of 5 family members who were shot and killed at various times." *Id.*

The ALJ also noted that there were inconsistencies in the record regarding Simmons's statements about his ability to read. The ALJ noted that when visiting Dr. McMillan, Simmons "initially asserted that he was completely illiterate, but the intake papers, which he completed without assistance, provided detailed information including addresses and phone numbers presented in neat handwriting." *Id.* The ALJ further noted that Simmons "apparently later admitted that he had left school in the 9th grade." *Id.* Similarly, the ALJ noted that Simmons "initially told Dr. Kalich that he could not read, but later conceded that he could, but 'not well.'" *Id.*[6]

Additionally, the ALJ offered two other reasons for finding Simmons to be "not fully credible," namely, the fact that he did not seek treatment until 2013 and "references in the record to drug seeking behavior." *Id.* at 32–33.

### 5. Step Five: Ability to Perform Other Jobs in the National Economy

At Step Five, the ALJ initially noted that Simmons: (1) "has no past relevant work"; (2) was a younger individual age 18—49 at the time he filed his application; (3) "has a limited

---

[6] While the ALJ asserts that Simmons informed Dr. Kalich "he could not read, but later conceded that he could, but 'not well,'" the record shows that, in fact, Simmons informed *Dr. Frances* (and not Dr. Kalich) that he "does read, just that he can't read very well." *See* AR 32, 664.

24

1  education and is able to communicate in English"; and (4) "[t]ransferability of job skills is not an

2  issue because [Simmons] does not have past relevant work." *Id.* at 33. He also noted that

3  Simmons's "ability to perform work at all exertional levels has been compromised by

4  nonexertional limitation." *Id.* at 34. The ALJ found that it was necessary to determine how

5  Simmons's nonexertional limitations "erode the occupational base of unskilled work at all

6  exertional levels." *Id.* He credited the VE's testimony that an individual of Simmons's age,

7  education, work experience, and residual functional capacity could work in various occupations,

8  including as a janitor, an order picker, a laboratory equipment cleaner, a house keeping cleaner,

9  and an assembly inspector. *Id.* Accordingly, the ALJ concluded that Simmons "is capable of

10  making a successful adjustment to other work that exists in significant numbers in the national

11  economy" and that "a finding of 'not disabled' is therefore appropriate." *Id.*

12  **III.    ANALYSIS**

13      **A.    Legal Standard Under 42 U.S.C. § 405(g)**

14          District courts have jurisdiction to review the final decisions of the Commissioner and

15  have the power to affirm, modify, or reverse the Commissioner's decisions, with or without

16  remanding for further hearings. 42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3).

17          When asked to review the Commissioner's decision, the Court takes as conclusive any

18  findings of the Commissioner which are free from legal error and supported by "substantial

19  evidence." 42 U.S.C. § 405(g). Substantial evidence is "such evidence as a reasonable mind

20  might accept as adequate to support a conclusion," and it must be based on the record as a whole.

21  *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "'Substantial evidence' means more than a

22  mere scintilla," *id.*, but "less than a preponderance." *Desrosiers v. Sec'y of Health & Human

23  Servs.*, 846 F.2d 573, 576 (9th Cir. 1988) (citation omitted). Even if the Commissioner's findings

24  are supported by substantial evidence, the decision should be set aside if proper legal standards

25  were not applied when weighing the evidence. *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir.

26  1978) (quoting *Flake v. Gardner*, 399 F.2d 532, 540 (9th Cir. 1978)). In reviewing the record, the

27  Court must consider both the evidence that supports and detracts from the Commissioner's

28  conclusion. *Smolen*, 80 F.3d at 1279 (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)).

If the Court identifies defects in the administrative proceeding or the ALJ's conclusions, the Court may remand for further proceedings or for a calculation of benefits. *See Garrison v. Colvin*, 759 F.3d 995, 1019–21 (9th Cir. 2014).

**B.      Whether the ALJ's Decision Should Be Reversed Because of Legal Error or Because it Was Not Supported by Substantial Evidence**

The Court has carefully reviewed the administrative record in this case and finds numerous legal errors in the ALJ's decision.  The Court further concludes the ALJ's decision is not supported by substantial evidence.

**1.  Step Three**

a.  Listings 12.03, 12.04 and 12.05

The ALJ considered three listings: 12.03 (Schizophrenic, Paranoid and Other Psychotic Disorders), 12.04 (Affective Disorders) and 12.05 (Intellectual disorder).   At the time of the ALJ's decision, listing 12.05 provided as follows:

> **12.05  Intellectual disability**: Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;
> OR
> B. A valid verbal, performance, or full scale IQ of 59 or less;
> OR
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;
> OR
> D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
> 1. Marked restriction of activities of daily living; or
> 2. Marked difficulties in maintaining social functioning; or
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> 4. Repeated episodes of decompensation, each of extended duration.

b.      Discussion

As to all three listings, the ALJ found based on the questionnaire completed by Dr. Pelc

that Simmons did not satisfy Paragraph B or D (12.05). Dr. Pelc reviewed Simmons's medical records but did not examine him. As discussed above, Dr. Pelc found that Simmons "[d]oes not demonstrate at least 2 marked impairments in B criteria, or one extreme limitation" and also found no evidence of decompensation. Dr. Pelc's assessment, however, is inconsistent with the opinions of physicians who examined Simmons and who treated him. Dr. Kalich found, among other things, that Simmons was moderately to severely limited in his activities of daily living and intermittently severely limited as to concentration, persistence and pace, pointing both to his poor working memory and his hallucinations. AR 607-613. Likewise, Dr. Frances stated in her June 20, 2014 letter that she did not believe Simmons would be able to "adapt to competitive work" because she would "expect him to have difficulty following instructions, keeping up with coworkers and consistently meeting production demands" and because "during times of increased symptomology, [she] would expect he would have difficulty staying focused." AR at 664.

"Cases in this circuit distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "[T]he opinion of a treating physician is ... entitled to greater weight than that of an examining physician, [and] the opinion of an examining physician is entitled to greater weight than that of a non-examining physician." Garrison, 759 F.3d at 1012. "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citations omitted). An ALJ can satisfy the "substantial evidence" requirement by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.*" Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998).

The Ninth Circuit has explained that "[w]here an ALJ does not explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over another, he errs." *Garrison v. Colvin*, 759 F.3d 995, 1012–13 (9th Cir. 2014) (citing *Nguyen v. Chater*, 100

F.3d 1462, 1464 (9th Cir.1996). "In other words, an ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion." *Id.*

Here, the ALJ briefly summarized the opinions of Drs. Kalich and Francis but offered no explanation for his decision to rely instead on the opinion of Dr. Pelc in assessing the severity of Simmons's limitations. The ALJ did proceed to make credibility findings as to Simmons's *own* statements about his limitations (discussed below), but these credibility findings do not satisfy the ALJ's burden to provide specific and legitimate reasons for concluding that Simmons's limitations resulting from his mental impairments were less severe than they were found to be by doctors who examined and treated him.

The ALJ also disregarded the opinion of Dr. Kalich as to Simmons's Full Scale IQ, which she found was only 52, placing Simmons within the range of Paragraph B of Listing 12.05, which would have been enough by itself to give rise to a finding of disabled at Step Three. While Dr. Kalich opined that this number might have underrepresented Simmons's abilities slightly, she did not consider her results to be invalid. Rather, she offered the opinion that even if Simmons were to retake the test his score would be no higher than 57. Indeed, Dr. Pelc relied on Dr. Kalich's opinion as to Simmons's IQ in finding that Simmons has borderline intellectual function. AR at 665-666. The ALJ apparently believed, however, that Dr. Kalich's opinion did not satisfy Listing 12.05, stating only that "that opinion does not satisfy of Listing 12.05, and I find the criteria therefore are not met. AR at 27. This reasoning is not supported by substantial evidence and therefore was erroneous.

In addition to ignoring the opinions of Simmons's treating and examining physicians, the ALJ ignored the third party function report completed by Eva George. Ms. George stated that Simmons needs reminders to take care of medical appointments, someone to "tell him what to do" when he performs house or yard work, that he gets confused when he takes public transportation and needs someone to go with him to show him which bus to take, that he cannot pay bills, count change, handle a savings account or use a checkbook and that he is afraid to be around other

people and seldom goes out.  AR at 347-354.  She also stated that he has trouble understanding both written and spoken instructions.  *Id*.  This lay testimony (which is consistent with the observations of a number of medical providers) indicates that Simmons has marked or severe limitations at least as to his activities of daily living and social functioning.  *See*, *e.g French v. Astrue,* No. 12-cv-33-BO, 2013 WL 447296 (D. N.C. Feb. 5, 2013)("[A]lthough the plaintiff has been able to maintain an outwardly pleasant and hygienic appearance, the evidence establishes that she has experienced other marked restrictions in her activities of daily living.  For example, her inability to manage her finances without the help of her uncle is evidence of marked restrictions").  Yet the ALJ made no mention of this testimony when he evaluated Simmons's mental capacity.

The Ninth Circuit has made clear that "lay witness testimony as to a claimant's symptoms or how an impairment affects ability to work is competent evidence, . . . and therefore cannot be disregarded without comment.  *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996) (citing *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993));  *see also Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987) (holding that "[d]isregard of [[d]escriptions by friends and family members in a position to observe a claimant's symptoms and daily activities] violates the Secretary's regulation that he will consider observations by non-medical sources as to how an impairment affects a claimant's ability to work.") (citing 20 C.F.R. § 404.1513(e)(2)).  The ALJ errs if he does not provide legitimate reasons for rejecting the description of a lay witness of the claimant's symptoms and limitations.  *Nguyen*, 100 F.3d at 1467.  The ALJ here provided no reasons for rejecting this evidence and therefore erred.

Therefore, the Court finds that the ALJ erred at Step Three and that his conclusions are not supported by substantial evidence.

### 2.  Step Four

At Step Four, the ALJ relied in part on his findings as to Paragraphs B and D (12.05) in determining Simmons's RFC.  Therefore, the legal errors discussed above with respect to Step Three also infect his determination of Simmons's RFC at Step Four.   The Court further concludes that the ALJ failed to provide adequate reasons for rejecting the claimant's own testimony regarding the degree of his limitations, frequently turning the evidence on its head to find that

29

evidence reflecting Simmons's limitations was instead evidence that he was not credible.

"To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must engage in a two-step analysis." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035–36 (9th Cir. 2007). First, the ALJ must find that "the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id*. at 1036. "Second, if the claimant meets this first test, and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Id*.

Here, the ALJ found based on medical evidence in the record that Simmons's intellectual functioning was borderline and that he suffered from psychotic disorder.[7] He did not, however, provide clear and convincing reasons for rejecting Simmons's testimony that his poor memory, inability to maintain focus due to hallucinations, and inability to understand instructions, among other things, significantly limited his ability to work.

First, the ALJ relied on various inconsistencies in Simmons's descriptions of his hallucinations (such as when they started and what the voices told him). "To determine whether the claimant's testimony regarding the severity of her symptoms is credible . . . the ALJ may consider . . . ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid." *Smolen*, 80 F.3d at 1284. However, in this case, Simmons's medical providers consistently characterized Simmons as "confused," a "poor historian," and having poor communication and comprehension skills, which are a reflection of his borderline intellectual function. Under these circumstances, the inconsistencies in his descriptions of his hallucinations do not support a reasonable inference that he does not suffer from such

---

[7] The ALJ's finding was grudging, however. As noted above, he stated that he was not "completely persuaded that Mr. Simmons even suffers from borderline intellectual functioning" but that he "include[s] it here due to the opinions of some examiners." AR at 31. To be clear, *every* medical professional to offer an opinion diagnosed Simmons with borderline intellectual function or mental retardation, or at least, found that these diagnoses needed to be ruled out. In reaching the contrary conclusion, the ALJ was simply offering his own interpretation of the medical records, which he is not qualified to do.

hallucinations. Indeed, it was on the basis of these hallucinations that all of his doctors diagnosed him with psychotic disorder -- a diagnosis the ALJ accepted. The ALJ's reliance on these discrepancies was not a clear and convincing reason to reject Simmons's testimony about his limitations.

Similarly, the ALJ pointed to purported discrepancies in Simmons's accounts of how many people he has known who have been shot. As a preliminary matter, the Court has reviewed the record and finds that while Simmons told various care providers different things (telling some he had seen an aunt shot to death, others that his neighbor had been shot and still others that five members of his family had been shot), there is no obvious inconsistency between the statements. Moreover, for the same reason the inconsistencies about his hallucinations do not constitute clear and convincing reasons for finding that Simmons's reports of his limitations are exaggerated, neither do these inconsistencies meet that standard.

The ALJ also pointed to various purported inconsistencies in Simmons's statements about his ability to read and understand, suggesting that statements to some care providers that he was "illiterate" demonstrated a lack of credibility because Simmons filled out some forms "neatly and legibly." It is unlikely, though, that Simmons's statements about his illiteracy were based on a nuanced understanding of what it means to be illiterate as opposed to having poor reading comprehension or limited writing skills. Simmons himself explained to one of the care providers to whom he had described himself as illiterate that he could read but not well. Further, Simmons's treating physician, Dr. Frances, pointed to these discrepancies as an illustration of Simmons's "difficulty tracking and communicating his condition and events in his life." AR at 664. In other words, his seemingly inconsistent statements were most likely the result of his borderline intellectual function. In relying on these discrepancies to discount the severity of Simmons's mental limitations, the ALJ erred.

The ALJ also suggested that Simmons was not fully credible because he engaged in "drug-seeking behavior." Under some circumstances, a claimant's request for pain medication may be found to be driven by addiction rather than pain and it may be proper for the ALJ to take that finding into account in evaluating the severity of the claimant's pain. For example, in *Edlund v.*

United States District Court<br>Northern District of California

31

*Massanari*, the Ninth Circuit found that an ALJ "provide[d] specific and legitimate reasons for rejecting" the opinion of a treating physician regarding the severity of the claimant's pain when the ALJ "cited the likelihood that unbeknownst to [the treating physician], [the claimant] was exaggerating his complaints of physical pain in order to receive prescription pain to feed his Valium addiction." 253 F.3d 1152, 1158 (9th Cir. 2001). There is no evidence of such conduct in this record however.

There is one reference in the record to Simmons asking Dr. Hauck for pain medications that was then characterized as "drug-seeking" behavior by another doctor and there is some evidence that Simmons took Vicodin for pain that was given to him by his family. Given that the medical records include numerous references to Simmons's complaints of chronic abdominal pain and that he went to see Dr. Hauck for treatment of that pain (as is written on the treatment note itself), it is hard to understand how this evidence supports an adverse credibility finding. The Court also notes that Dr. Hauck's treatment note contained no diagnosis or any assessment of Simmons's chronic pain, and therefore, his statement does not provide any evidence at all that Simmons's request for pain medication was for any reason other than to alleviate the abdominal pain he was experiencing. Nor do his other care providers suggest that Simmons has ever been addicted to any pain medications (though it is undisputed that for some period of time he frequently smoked marijuana). Therefore, the ALJ's reliance on purported "drug-seeking behavior" does not constitute a clear and convincing reason for rejecting Simmons's testimony as to the extent and limiting effects of his impairments. [8]

_____

[8] The ALJ also erred in failing to address Simmons's abdominal pain in his RFC. The record contains evidence that Simmons had had surgery as a baby and that he had been experiencing chronic abdominal pain in the last three years. Dr. Cotter found tenderness around his scar and concluded that Simmons's pain could have been a result of his past surgeries. This evidence is "objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain." *Lingenfelter*, 504 F.3d at 1035–36. Consequently, the ALJ was required to assess the credibility of Simmons's testimony about the limiting effects of his abdominal pain in developing his RFC. Instead, it appears the ALJ incorrectly assumed that because he did not find that Simmons's abdominal pain was a severe impairment at Step Two he did not need to consider it at Step Four. *See Angeli v. Astrue*, No. CIVS06-2592 EFB, 2008 WL 802334, at *3 (E.D. Cal. Mar. 25, 2008) (Once a claimant prevails at Step Two, 'regardless of which condition is found to be severe, the Commissioner proceeds with the sequential evaluation, considering at each step *all* other alleged impairments and symptoms that may impact her ability to work.'") (citing 42 U.S.C. § 423(d)(2)(B)) (emphasis added).

32

Finally, the ALJ relied on Simmons's failure to seek psychiatric treatment until 2013 in support of his RFC. This is not a clear and convincing reason to reject Simmons's testimony. First, "[d]isability benefits may not be denied because of the claimant's failure to obtain treatment he cannot obtain for lack of funds." *Orn v. Astrue*, 495 F.3d at 638 (9th Cir. 2007) (quoting *Gamble v. Chater*, 68 F.3d 319, 321 (9th Cir. 1995)). Here, Simmons's financial difficulties were compounded by his borderline intellectual functioning. In particular, he offered testimony that he simply did not know how to go about accessing medical care and did not seek treatment until an "auntie" showed him what he needed to do. This is entirely consistent with the treatment notes emphasizing Simmons's need for a case manager to help coordinate his treatment. Moreover, "the Ninth Circuit has repeatedly and particularly criticized the use of a lack of treatment to reject mental complaints both because mental illness is 'notoriously underreported' and because 'it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation.'" *Sababu v. Colvin*, No. 14-cv-05139-DMR, 2016 WL 1110264, at *9 (N.D. Cal. Mar. 22, 2016) (quoting *Nyugen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996)). For all of these reasons, Simmons's failure to seek treatment until 2013 does not constitute a clear and convincing reason to reject his testimony.

Therefore, the Court concludes that the ALJ's analysis at Step Four is characterized by legal error and is not supported by substantial evidence.

### C. Whether the Court Should Reverse for Further Proceedings or for Award of Benefits

If an ALJ has improperly failed to credit claimant testimony or medical opinion evidence, a district court must credit that testimony as true and remand for an award of benefits if three conditions are satisfied:

> (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ failed to provide legally sufficient reasons for rejecting evidence . . .; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.

*Garrison v. Colvin*, 759 F.3d 995, 1020 (9th Cir. 2014). Under such circumstances, a court should not remand for further administrative proceedings to reassess credibility. *See id.* 1019–21. This

33

"credit-as-true" rule, which is "settled" in the Ninth Circuit, *id.* at 999, is intended to encourage careful analysis by ALJs, avoid duplicative hearings and burden, and reduce delay and uncertainty facing claimants, many of whom "suffer from painful and debilitating conditions, as well as severe economic hardship." *Id.* at 1019 (quoting *Varney v. Sec'y of Health & Human Servs.*, 859 F.2d 1396, 1399 (9th Cir. 1988)).

In this case, the Court finds that the record has been fully developed, that the ALJ failed to provide legally sufficient reasons for rejecting evidence, and that if the improperly credited evidence were credited as true the ALJ would be required to award benefits. First, as discussed above, the ALJ improperly disregarded the full-scale IQ test obtained by Dr. Kalich. Crediting that evidence, Simmons is qualified as disabled under Listing 12.05 Paragraph C. Second, the ALJ improperly ignored the opinions of Simmons's treating and examining physicians in assessing his mental limitations, both at Step Three and Step Four. Dr. Frances offered the opinion that Simmons would not be able to follow instructions or maintain his focus due to hallucinations and memory problems, especially when he was "symptomatic." Likewise, Dr. Kalich found that Simmons's problems with concentration were intermittently severe. In light of the VE's testimony that the jobs that he listed would not be available if a worker is "off task" because of his problems and must be refocused by a supervisor for 15% or more of the time in a day, the ALJ would have been required to find at Step Five that Simmons was disabled if he had properly credited the opinion of Drs. Frances and Kalich. Third, the ALJ failed to address the descriptions of Simmons's mental limitations offered in the Function Report of Ms. George. Her descriptions support the conclusion that Simmons would need close supervision in the workplace to perform even simple repetitive tasks, something the VE testified would not be available in the unskilled jobs that he identified in response to the ALJ's hypotheticals.

## IV.    CONCLUSION

For the reasons stated above, the Court GRANTS Simmons's Motion for Summary Judgment, DENIES the Commissioner's Motion for Summary Judgment, and REMANDS this case to the Commissioner for the award of benefits.

**IT IS SO ORDERED.**

Dated:  March 27, 2018

_____
JOSEPH C. SPERO
Chief Magistrate Judge